**FILED**

**June 5, 2015**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 12:24 PM**



### COURT OF WORKERS' COMPENSATION CLAIMS
### DIVISION OF WORKERS' COMPENSATION

| | |
|---|---|
| **ANNA M. KING,**<br>    **Employee,** | **Docket No.:    2014-06-0051** |
| **v.** | **State File No.: 78537-2014** |
| **AL'S FOODLAND,**<br>    **Employer,** | **Date of Injury: September 15, 2014** |
| **and** | **Judge: Pamela B. Johnson** |
| **EMPLOYERS PREFERRED INS. CO.**<br>**Insurance Carrier.** | |

---

## EXPEDITED HEARING ORDER

---

THIS CAUSE came before the undersigned Workers' Compensation Judge upon the Request for Expedited Hearing filed by the Employee, Anna M. King (Ms. King), on October 29, 2014, pursuant to Tennessee Code Annotated section 50-6-239. Upon review of Ms. King's Request for Expedited Hearing, the evidence presented at the hearing, the arguments of counsel, and in consideration of the applicable law, the Court finds Ms. King is entitled to the some of the benefits requested.

### Issues

*Whether Ms. King is entitled to temporary disability benefits from September 22, 2014, through March 9, 2014[1]; and*

*Whether Ms. King is entitled to reimbursement of out-of-pocket medical expenses.*

---

[1] This Court notes that the parties did not certify the disputed issue of Ms. King's entitlement to past or future temporary total disability (TTD) benefits and/or past or future temporary partial disability (TPD) benefits on the Dispute Certification Notice (DCN) filed March 10, 2015. However, Ms. King clearly indicated on her Petition for Benefit Determination (PBD) filed October 29, 2014 that the issue of entitlement to temporary disability benefits was in dispute. Ms. King further indicated the disputed issue of entitlement to temporary disability benefits on the face of her Request for Expedited Hearing filed March 11, 2015. The parties further identified communication difficulties over the course of the claim. The Court recognizes further that the Mediating Specialist, who presented the original DCN to the parties for review, then took a leave of absence and a different Mediating Specialist issued and filed the final DCN. More importantly, the parties agreed during the expedited hearing that the issue of Ms. King's entitled to temporary disability benefits was an issue for the Court to determine. This Court acknowledges the decision of the Workers' Compensation Appeals Board in *LaToya Dorsey v. Amazon.com, Inc.*, No. 2015-01-0017 ((Tenn. Work. Comp. App. Bd., May 14, 2015). However, in light of judicial economy and the necessary efficient handling of workers' compensation claims, it would be unjust for this Court to refer the parties back to Mediation Services for completion of a subsequent PBD and issuance of a new DCN.

## Stipulations of the Parties

The parties, through counsel, announced to the Court the following stipulations:

- The date of injury is September 15, 2014.
- Ms. King provided proper notice of the September 15, 2014 injury to Al's Foodland.
- Ms. King filed the Petition for Benefit Determination within the applicable statute of limitations.
- Ms. King's average weekly wage is $361.60, resulting in a workers' compensation rate of $241.08.
- Ms. King received temporary total disability benefits from October 2, 2014, through October 22, 2014, and Al's Foodland recommenced temporary total disability benefits on March 10, 2015.

## Evidence Submitted

The Court designated the following as the Technical Record:

- Petition for Benefit Determination (PBD), filed October 29, 2014
- Dispute Certification Notice, filed March 10, 2015
- Request for Expedited Hearing, filed March 11, 2015
- Order of Transfer, filed April 1, 2015
- Al's Foodland Pre-Hearing Statement, filed April 21, 2015.

The Court did not consider attachments to the above filings unless admitted into evidence during the Expedited Hearing. The Court considered factual statements in the above filings and any attachments to them as allegations unless established by the evidence.

The Court admitted into evidence the following:

- EXHIBIT 1: Medical Records from Tennessee Orthopedic Alliance (9 pages)
- EXHIBIT 2: Medical Records from Livingston Chiropractic (50 pages)[2]
- EXHIBIT 3: Medical Records from Zion Wellness and Medical Clinic (2 pages)
- EXHIBIT 4: Medical Expenses from Premier Radiology and Zion Wellness (2 pages)
- EXHIBIT 5: Al's Foodland Incident Report, September 15, 2014 (1 page)
- EXHIBIT 6: Panels of Physicians (3 panels)
- EXHIBIT 7: Wage Statement, Form C-41, and Calculations (2 pages)
- EXHIBIT 8: For Identification Only: Medical Records and Medical Expense from Premier Radiology (3 pages)[3]

---

[2] The Court incorrectly identified Exhibit 2 as containing sixty (60) pages, but the actual page count is fifty (50) pages.
[3] The Court marked the Premier Radiology CT report and invoice for identification purposes only due to an objection raised by counsel for Al's Foodland to relevance and lack of timeliness. Upon marking Exhibit 8 for

- EXHIBIT 9: Ms. King's Responses to Interrogatories and Requests to Produce Documents
- EXHIBIT 10: Itemization of Temporary Disability Benefits paid (1 page).

**History of Claim**

Ms. King worked as the frozen food manager for Al's Foodland. *See* PBD. On September 15, 2014, she hurt her back while twisting to put away freight. Ms. King timely reported the incident on September 19, 2014. *See* Exhibit 5. Al's Foodland provided Ms. King with a panel of physicians from which she selected Livingston Chiropractic Clinic. *See* Exhibit 6, p. 1.

On September 22, 2014, Dr. Alexander Badru of Zion Wellness and Medical Clinic issued a work excuse, indicating "Anna King has been seen in our office on 09/22/2014. She is excused form work/ school from the dates of 09/22/2014 to _____." The work excuse further indicated "Pt is to be out of work until further notice." *See* Exhibit 3, 09/22/2014 Excuse Note. The record does not contain an accompanying medical record detailing the reason for the office visit. On the same date, Ms. King paid $150.00 to Zion Wellness. *See* Exhibit 4.

Dr. Steven Livingston examined Ms. King on October 2, 2014. Dr. Livingston noted Ms. King's past surgical history was positive for a fractured T12 vertebra following a motor vehicle accident. Ms. King underwent surgery for placement of Herrington rods. Dr. Livingston noted that, after three years, the treating surgeon recommended surgery to remove the rods, but Ms. King waited seven years before undergoing the hardware removal surgery. As a result, more segmental fusion than desired occurred and the surgeon could not remove four hooks. After reviewing x-rays of the spine, Dr. Livingston diagnosed thoracic subluxation, thoracic spinal pain, degeneration of the thoracic disc, thoracic disc displacement without myelopathy, thoracic sprain/strain, muscle spasms, myofascial pain syndrome, and ribs sprain and strain. Dr. Livingston recommended treatment four to five times (4-5x) per week until the pain reduced and range of motion and function increased. Based upon Dr. Livingston's report, Al's Foodland initiated temporary total disability benefits beginning October 2, 2014. *See* Exhibit 2, 10/2/2014 visit.

Ms. King continued to treat with Dr. Livingston. *See* Exhibit 2. On October 10, 2014, Dr. Livingston reduced treatments to three times (3x) per week. On October 16, 2014, he reduced treatment to two times (2x) per week, "hoping one more week and she could be done."

On October 17, 2014, Ms. King paid Premier Radiology $41.00 for films of her bilateral ribs. The medical receipt lists Dr. Livingston as the referring physician. The Premier Radiology Report is contained in the records of Dr. Livingston and identifies no rib fractures.

---

identification purposes only, the Court advised Ms. King that she could attempt to introduce the records into evidence during her testimony and, at that time, if an objection was made, the Court would determine whether the records should be admitted into evidence. Ms. King made no further effort to introduce the records contained in Exhibit 8 during her testimony. This Court therefore sustains the objection and excludes Exhibit 8 based on lack of relevance.

On October 22, 2014, Dr. Livingston indicated, "I feel she should be able to return to work in one week. Approximately 10-29-2014." On that date, Ms. King reported ninety percent (90%) improvement of her symptoms. On October 29, 2014, Ms. King cancelled her appointment with Dr. Livingston and rescheduled for November 3, 2014.

On October 31, 2014, Dr. Badru issued another work excuse, indicating "Anna King has been seen in our office on 10/31/2014. She is excused from work/ school from the dates of 10/31/2014 to _____." Dr. Badru further indicated "Pt is to be out of work until further notice." *See* Exhibit 3, 10/31/2014 Excuse Note. The record does not contain an accompanying medical record detailing the reason for the office visit.

On November 3, 2014, Ms. King cancelled her appointment and advised Dr. Livingston's office that her primary care physician, Dr. Alexander Badru, instructed her not to return for any chiropractic treatment and referred her to physical therapy instead. Following her cancellation on November 3, 2014, Dr. Livingston wrote Ms. King, stating:

> Based on our conversation today we will dismiss you from our treatment. Today we discussed that you [sic] medical doctor, Alexander Badru M.D. has advised that you no [sic] return to our office for treatment, and that if you did return, to no let us adjust you. Dr. Badru advises that you begin physical therapy instead. Our records will show that on our last visit of 10-22-2014 that you were approximately 90% back to full recovery. Our expected return back to work was going to be one week from that date, which would have been 10-29-14. At this point as you wish, we will release you from our care.

*See* Exhibit 2, 11/3/2014 Letter.

On November 11, 2014, Dr. Livingston noted that Ms. King contacted his office "yesterday" and made an appointment. Dr. Livingston further noted that he called Ms. King "to discover what was going on." In his office note of November 11, 2014, Dr. Livingston outlined the conversation:

> Today she stated the following listed below.
>
> 1.      After her last treatment here her pain increased for 3 days. Then subsided again. I had felt she was 90% back to normal after my last evaluation, she claims today that that last treatment flared her up. I discussed today, that the propper thing to do would have been to return here and discuss this flare and and [sic] likely we could have treated her again and reduced her pain again. On that final treatment we did do more range of motion testing to see how close she was to being able to return to work. Quite possible that this aggravated the area temporarily.

4

2.     Anna King states that her MD. [sic] Dr. Alexander Badru had told her to not return to our office for treatment, and that if she did return that she should not let use adjust her spine. Dr. Badru also wanted her to do physical therapy instead.

3.     Anna King states that her Workers [sic] compensation claims manager told her that she would not have chosen to come to our office in the first place. That an orthopedist would have been a far more better choice.

4.     Based on all the reasons above is why she chose to not return for treatment in our office. Now she says she basically feels she has to return to our office to get released to go back to work. My office had never officially taken her off work, her MD, Dr. Badru had taken her off work before we ever seen [sic] her. …

At this point the patient had already been dismissed from treatment on 11/3/2014 after she called in and said that Dr. Badru MD told her not to return to us. With all that seems to be transpiring or has transpired we cannot accept back this patient…I told Anna that it might be a good idea to have an evaluation with an orthopedic doctor is [sic] she feels that she has not fully recovered.

*See* Exhibit 2, 11/11/2014 visit.

On November 12, 2014, Dr. Livingston issued a "To Whom It May Concern" letter stating in part,

> Anna King's last evaluation with me was on 10-22-2014. On that visit she was in my opinion at 90% back to full recovery. On this last visit on 10-22-2014, I had discussed with her that she should be able to return to full duty in one week, which would have been on 10-29-2014. But I had asked her to get the approval from her medical doctor and to see if he agreed with this plan…
>
> Anna King's first visit was on 10-2-2014, and [she] had a total of 9 treatments. She improved exactly as expected and reached 90% recovery in my opinion. On her first visit, I felt she could have performed light duty work, and if she could have worked as a check out, I think she would have been ok. But, if any lifting over 10 pounds or any thoracic flexion past 25 degrees was going to be required that she wouldn't be able to perform those duties. I told her that she should discuss this with her MD and her employer and see what the options were. The feedback that we got from Anna, was that her MD was not comfortable with her working at all. This was acceptable with me as well…

5

On 10-22-2014, I was expecting that Anna King would be able to return to work on 10-29-2014. I would also recommend that she avoid any heavy lifting, over 15 pound [sic] off the floor, be avoided for an additional 2 weeks, which would took [sic] her to about 11-12-14. I would have expected that on 10-29-14 that being a check out or any other activity that didn't require heavy lifting to [sic] be ok. She has severe degenerative arthritic changes in her spine. Most of this is due to hardware that was left in her spine from a past spinal surgical procedure many years ago, I would not expect her spine to ever handle much heavy lifting. This is the area that was damaged concerning this case, if she goes back to the same activity, I would expect a high likelihood that she will get hurt again. But any other job that doesn't require heavy lifting off the floor of over 15 pounds, I feel she should be fine.

*See* Exhibit 2, 11/12/2014 letter.

On December 10, 2014, defense counsel for Al's Foodland wrote Dr. Livingston to request an opinion on causation. Dr. Livingston marked "No" when asked, "[I]s it your opinion within a reasonable degree of medical certainty that the current symptoms and need for treatment, if any, did not primarily arise out of or occur in the course of King's employment on September 15, 2014." Dr. Livingston further commented, "[d]uring this time there was some profession [sic] misconduct that has interfered with the doctor/patient relationship that I can no longer treat her or give any opinions to her current status." *See* Exhibit 2, 12/10/2014 Letter.

Al's Foodland provided Ms. King a panel of orthopedic physicians from which she selected Dr. Gray C. Stahlman of Tennessee Orthopedic Alliance on January 27, 2015. *See* Exhibit 6, pp. 2-3. Ms. King's first saw Dr. Stahlman on February 12, 2015. *See* Exhibit 1, 02/12/2015 visit. Dr. Stahlman obtained x-rays of the pelvis and lumbar spine and ordered an MRI of the thoracic spine. Dr. Stahlman diagnosed pain in the thoracic spine and carpal tunnel syndrome. *Id.* Dr. Stahlman completed a WorkLink Physician's Report, noting the diagnosis of thoracic pain was work-related. Dr. Stahlman further noted that Ms. King could not work. *See* Exhibit 1, 02/12/2015 WorkLink report.

Ms. King returned to Dr. Stahlman on March 10, 2015, for review of the MRI. *See* Exhibit 1, 03/10/2015 visit. Dr. Stahlman referred Ms. King for physical therapy and released her to return to limited duty with no lifting over twenty pounds (20 lbs.) maximum and no occasional stooping, bending, or twisting. *See* Exhibit 1, 03/10/2015 WorkLink report. On this date, Al's Foodland recommended temporary total disability payments to Ms. King.

On April 10, 2015, Dr. Stahlman re-evaluated Ms. King for a thoracic strain. Dr. Stahlman noted, "She still is dealing with significant trigger point and tightness in her left periscapular region and trapezius region versus the right. She has found a new job working security at Bridgestone Distribution." Dr. Stahlman referred Ms. King to a physiatrist, Dr. Christopher Ashley. *See* Exhibit 1, 04/10/2015 visit.

Ms. King filed a Petition for Benefit Determination on October 29, 2014. The parties did not resolve the disputed issues through mediation and the Mediating Specialist filed the Dispute Certification Notice on March 10, 2015. On March 11, 2015, Ms. King filed a Request for Expedited Hearing. This Court conducted an in-person evidentiary hearing on April 27, 2015. Ms. King testified on her own behalf. John Carmen testified for Al's Foodland.

## Ms. King's Contentions

Ms. King alleges that on Monday, September 15, 2014, she was putting up freight in the freezer. As she stacked freight in the corner, she twisted around and "sprung" her back. She finished putting away freight, and then continued to the cash register to work. After finishing her shift, Ms. King went home. She testified that her pain was horrible that night, but she returned to work on Tuesday, Wednesday, and Friday. Over those three days, Ms. King unpacked freight from two more trucks. She testified further that, by Friday night (September 19, 2014), she could not turn. She reported the incident to John Carmen and went to the emergency room. She testified that, over the weekend, she could not turn over in bed, experienced difficulty walking, and suffered "horrific pain." The emergency room instructed her to see her primary care physician on Monday if unable to work. She saw her primary care physician on Monday (September 22, 2014).

After she saw her primary care physician, Ms. King testified she rested the remainder of the week, and then received a panel of physicians from John Carmen, the Foodland office manager. She began chiropractic treatment with Dr. Livingston. His therapy seemed to help, but it only provided temporary relief. She testified that Dr. Livingston became angry with her because she told him that his treatment hurt her. She also argued that he recanted on his return to work statement.

Ms. King additionally testified that, whenever she went back to doing light duty tasks, swelling and pain returned to her back. She testified that she asked "Glenn" for a light duty job but he stated she had to work frozen foods. She admitted that she did not pursue anything else. She testified that she was unable to pursue anything else, because she continued to have difficulties walking and numbness in her hand. She later accepted a light duty job that did not require lifting. She testified that, although she worked, she worked in pain.

Ms. King contends that Al's Foodland owes her disability benefits for the time she was off and unable to work. She claims she suffered during this time, but went without medical attention and without income as well. She argued that she accepted a light duty job and hoped to continue working, but she works with pain.

## Al's Foodland's Contentions

Al's Foodland contends that it paid temporary disability benefits based upon the restrictions assigned by the authorized treating physicians. There is no competent medical evidence to support a claim for temporary disability benefits for the period in question. Additionally, Ms. King was non-compliant with treatment and failed to communicate with Al's

Foodland as to her medical status and ability to return to work.

Mr. Carmen testified that Ms. King sent him a Zion Wellness work slip, and asked him to fax it to "Fran," the workers' compensation insurance adjuster. During this telephone conversation in October, 2014, Mr. Carmen advised Ms. King that he was having trouble making the work schedule. He testified that he asked her to let him know on Fridays, when the schedule is typically prepared, whether she intended to work the following week. On October 29, she called to request an email address and fax number and she notified him that she was filing a "grievance" to get things paid. Mr. Carmen testified that October 29, 2014, was the last time he talked to her for several months.

Al's Foodland obtained through cross-examination testimony that Ms. King began working as a security guard for Covenant Security on March 21, 2015. She earns $9.75 per hour and hired to work 24 hours per week, or 3 – 8 hour shifts. She currently works 30 hours per week from 11 p.m. to 7 a.m. on Monday, Tuesday, and Wednesday nights and, because her employer is short-staffed, her employer asked her to pick up a Friday.

Al's Foodland provided several arguments opposing Ms. King's request for additional temporary disability benefits. For the period from October 22, 2014, the date of the last temporary total disability payment, until February 12, 2015, Al's Foodland argues that there is no proof of an authorized treating physician restricting Ms. King from working. Any restrictions during the period in question were assigned by her primary care physician, who treated her for multiple health problems. Furthermore, She was non-compliant in her treatment with Dr Livingston over this period. Her cancellation of several appointments interrupted Dr. Livingston's anticipated full release to work. She did not communicate with Al's Foodland and then she secured alternative employment.

Al's Foodland recommenced temporary total disability benefits on March 10, 2015, and continues to pay temporary total disability benefits. For the period from February 12, 2015, through March 9, 2015, Al's Foodland acknowledged an obligation to pay temporary total disability benefits based upon Dr. Stahlman's opinion.

For the period beginning March 10, 2015, and ongoing, Al's Foodland argues that any benefits paid should be paid based upon a temporary partial disability calculation. Al's Foodland avers that Ms. King's average weekly wage is $292.50 for her current job at Covenant security, which is $70 less per week than what she earned at Al's Foodland. Thus, it argues that it is entitled to a credit for the overpayment of benefits beginning March 10, 2015.

Al's Foodland contends Ms. King is not entitled to reimbursement of medical expenses for unauthorized care. As to $191 sought, there is no testimony establishing a causal relationship between the medical expenses and the work injury. Al's Foodland argues that Dr. Stahlman is the authorized treating physician, the workers' compensation carrier authorized his treatment, and his recent referral "is being taken care of." For these reasons, Al's Foodland asks this Court to deny Ms. King's request for medical expenses and additional temporary disability benefits.

8

## Findings of Fact and Conclusions of Law

### *Standard Applied*

The Workers' Compensation Law shall not be remedially or liberally construed in favor of either party but shall be construed fairly, impartially, and in accordance with basic principles of statutory construction favoring neither the employee nor employer. Tenn. Code Ann. 50-6-116 (2014). Tennessee Code Annotated section 50-6-239(c)(6) provides that "[u]nless the statute provides for a different standard of proof, at a hearing, the employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence." Tenn. Code Ann. section 50-6-239(c) (2014). A different standard of proof exists for the issuance of interlocutory orders at Expedited Hearings than the standard of proof required at compensation hearings. *See McCord v. Advantage Human Resourcing,* No. 2014-06-0063 (Tenn. Work. Comp. App. Bd., March 27, 2015). A Workers' Compensation Judge may enter an interlocutory order for medical or temporary benefits upon a determination that the injured employee would likely prevail at a hearing on the merits. Tenn. Code Ann. 50-6-239(d)(1) (2014); *cf. McCall v. Nat'l Health Care Corp.,* 100 S.W.3d 209, 214 (Tenn. 2003).

### *Factual Findings*

The Court finds that Ms. King sustained an injury to her thoracic spine on September 15, 2014, while working for Al's Foodland. Ms. King reported the work incident to Al's Foodland on September 19, 2014. Al's Foodland provided Ms. King a panel of physicians and she selected Dr. Livingston as her authorized treating physician.

Ms. King received authorized medical treatment with Dr. Livingston from October 2, through October 22, 2014. Dr. Livingston dismissed Ms. King from his care on November 3, 2014, due to several cancelled appointments and professional interference negatively affecting the doctor/patient relationship. Dr. Livingston anticipated releasing Ms. King to return to work on October 29, 2014, with restrictions of no lifting over fifteen (15) pounds from the floor for two (2) weeks. Dr. Livingston further indicated that he did not expect Ms. King's spine to perform much heavy lifting, and that she risked re-injury if she returned to the "same activity." Dr. Livingston additionally recommended an evaluation with an orthopedic physician if Ms. King felt that she had not fully recovered.

Al's Foodland provided Ms. King a panel of orthopedic physicians and she selected Dr. Stahlman. Ms. King received authorized medical treatment with Dr. Stahlman, beginning February 12, 2015. Dr. Stahlman placed Ms. King off work from February 12, 2015, until completion of an MRI. On March 10, 2015, Dr. Stahlman released Ms. King to return to limited duty with no lifting over twenty pounds (20 lbs.) maximum and no occasional stooping, bending, or twisting.

Ms. King last worked for Al's Foodland on September 19, 2014. Al's Foodland did not offer light duty work to Ms. King. Ms. King accepted a light duty position as a security guard for Covenant Security on March 21, 2015, working thirty (30) hours per week at $9.75 per hour.

Ms. King has an average weekly wage of $361.60, resulting in a workers' compensation rate of $241.08 per week. Al's Foodland paid Ms. King temporary total disability benefits from October 2, through October 22, 2014, for a total of $723.24. Al's Foodland recommended temporary total disability benefits on March 10, 2015. As of the date of the hearing on April 27, 2015, Al's Foodland paid temporary total disability benefits from March 10, 2015 through May 4, 2015, for a total of $1,928.64.

*Application of Law to Facts*

*Whether Ms. King is entitled to temporary disability benefits from September 22, 2014, through March 9, 2015.*

Ms. King seeks temporary disability benefits from September 22, 2014, through March 9, 2015. Tennessee workers' compensation law establishes four distinct categories of compensable disabilities entitling an injured employee compensation. The four categories include: (1) temporary total disability, (2) temporary partial disability, (3) permanent partial disability, and (4) permanent total disability. Tennessee Code Annotated section 50-6-207 (2014) provides in part:

> (1) Temporary Total Disability.
>
> (A) For injury producing temporary total disability, [the compensation shall be] sixty-six and two thirds percent (66 2/3%) of the average weekly wages...
>
> (2) Temporary Partial Disability.
>
> (B) In all cases of temporary partial disability for claims with a date of injury on or after July 1, 2014, the compensation shall be sixty-six and two thirds percent (66 2/3%) of the difference between the average weekly wage of the worker at the time of the injury and the wage the worker is able to earn in the worker's partially disabled condition.

Tenn. Code Ann. § 50-6-207 (1) and (2) (2014).

In other words, the injured employee shall receive compensation "for the period of time during which [the employee] suffers temporary total disability on account of the injury," and thus the purpose served by such benefits is to allow for "the healing period during which the employee is totally prevented from working." *Gluck Bros., Inc. v. Coffey*, 431 S.W.2d 756, 759 (Tenn. 1968). To be entitled to temporary total disability benefits, an employee must prove that (1) the employee was totally disabled to work by a compensable injury; (2) that there was a causal connection between the injury and the inability to work; and (3) the duration of that period of disability. *See Cleek v. Wal-Mart Stores, Inc.*, 19 S.W.3d 770 (Tenn. 2000). Temporary partial disability arises when "the temporary disability is not total." 20 Reynolds § 14:4, at 213.

In the present case, the evidence introduced at the hearing established that the authorized treating physician, Dr. Livingston, restricted Ms. King from working from October 2, through October 22, 2014, during which time Al's Foodland paid temporary total disability benefits. However, Ms. King failed to demonstrate that any physician, authorized or otherwise, restricted

her from working because of her work injury prior to October 2, 2014. Accordingly, this Court finds Ms. King is not entitled to temporary disability benefits from September 22, 2014, through October 1, 2014.

After Ms. King's last appointment with Dr. Livingston on October 22, 2014, for the reasons outlined in the History of the Claim and this Court's Findings of Fact, Dr. Livingston dismissed Ms. King from his care. In a letter dated November 12, 2014, Dr. Livingston addressed Ms. King's return to work status and stated in part:

> On 10-22-2014, *I was expecting that Anna King would be able to return to work on 10-29-2014. I would also recommend that she avoid any heavy lifting, over 15 pound [sic] off the floor, be avoided for an additional 2 weeks, which would took [sic] her to about 11-12-14. I would have expected that on 10-29-14 that being a check out or any other activity that didn't require heavy lifting to [sic] be ok.* She has severe degenerative arthritic changes in her spine. Most of this is due to hardware that was left in her spine from a past spinal surgical procedure many years ago, *I would not expect her spine to ever handle much heavy lifting. This is the area that was damaged concerning this case, if she goes back to the same activity, I would expect a high likelihood that she will get hurt again. But any other job that doesn't require heavy lifting off the floor of over 15 pounds, I feel she should be fine.*

*See* Exhibit 2, 11/12/2014 letter (emphasis added).

For the period beginning October 23, 2014, Ms. King testified that she asked "Glenn" at Al's Foodland if she could return to work light duty, but she was told she had to work frozen foods, a job she knew to be heavy duty. While Al's Foodland introduced testimony through John Carmen that Ms. King did not call-in on Fridays as requested to advise of her anticipated return to work date, Al's Foodland offered no evidence of any attempt to return Ms. King to work within the restrictions recommended by Dr. Livingston in his letter of November 12, 2014. This Court therefore finds that Ms. King is entitled to temporary partial disability benefits, beginning October 23, 2014, through February 11, 2015, the date Dr. Stahlman placed her off work until completion of an MRI. Because Ms. King testified that she could not work during this period, she is entitled to temporary partial disability benefits at $241.08 per week, which equates to $3,822.84.

For the period beginning February 12, 2015, the evidence in this case demonstrates that Dr. Stahlman placed Ms. King off work from February 12, 2015, through March 9, 2015. As acknowledged by Al's Foodland during the expedited hearing, this Court finds Ms. King is entitled to temporary total disability benefits during that period at $241.08 per week, which equates to $895.44.

For the period beginning March 10, 2015, Dr. Stahlman's records indicate that he

11

released Ms. King to return to limited duty with no lifting over twenty pounds (20 lbs.) maximum and no occasional stooping, bending, or twisting. Ms. King testified that she started working as a security office for Covenant Security on March 21, 2014. This Court finds that Ms. King is entitled to temporary partial disability benefits at $241.08 per week for the period of March 10, 2015, through March 20, 2015, for a total of $378.84.

From March 21, 2015, through the date of this order, Ms. King earned an average weekly wage of $292.50 as a security officer. Applying Tennessee Code Annotated section 50-6-207(2)(B), the difference between Ms. King's average weekly wage at the time of the injury ($361.60) and the average weekly wage earned by Ms. King in her partially disabled condition ($292.50) is $69.10. Sixty-six and two thirds percent (66 2/3%) of the difference equates to $46.07 per week. Therefore, this Court finds that Ms. King is entitled to temporary partial disability benefits at $46.07 per week beginning March 21, 2015, through the date of this order, which equates to eleven weeks, or $506.77.

Ms. King is further entitled to ongoing temporary partial disability benefits until she is released to return to full-duty work by an authorized treating physician or placed at maximum medical improvement. Ms. King shall provide Al's Foodland or its workers' compensation carrier with copies of her paychecks in order to calculate the appropriate amount of ongoing temporary partial disability benefits to be paid.

Based upon the foregoing, Ms. King is entitled to a payment of $5,603.89 in temporary total and temporary partial disability benefits for the periods outlined above. This Court notes that Al's Foodland paid temporary disability benefits totaling $1,928.64 for the period of March 10, 2015 through May 4, 2015. The Court finds that Al's Foodland is entitled to a credit for the benefits paid during this time, leaving a total amount due in the amount of $3,675.25.

*Whether Ms. King is entitled to reimbursement of out-of-pocket medical expenses.*

Ms. King seeks payment of out-of-pocket expenses of $191.00. Al's Foodland argued that the evidence presented in this case failed to establish a causal connection between the medical expenses and the September 15, 2014 work injury. This Court agrees. Therefore, Ms. King's claim for reimbursement of medical expenses of $191.00 is denied at this time.

**IT IS, THEREFORE, ORDERED** as follows:

1. Ms. King is not entitled to temporary disability benefits from September 22, 2014, through October 1, 2014.

2. Ms. King is entitled to temporary partial disability benefits, beginning October 23, 2014 through February 11, 2015, at the rate of $241.08 per week, which equates to $3,822.84.

3. Ms. King is entitled to temporary total disability benefits from February 12, 2015, through March 9, 2015, at the rate of $241.08 per week, which equates to $895.44.

12

4.  Ms. King is entitled to temporary partial disability benefits at the rate of $241.08 per week for the period of March 10, 2015, through March 20, 2015, for a total of $378.84.

5.  Ms. King is entitled to temporary partial disability benefits at $46.07 per week beginning March 21, 2015, through the date of this order, which equates to eleven weeks, or $506.77.

6.  Al's Foodland is entitled to a credit for the benefits paid from March 10, 2015, through May 4, 2015, in the amount of $1,928.64, leaving a total amount due of $3,675.25.

7.  Al's Foodland or its workers' compensation insurance carrier shall continue to pay to Ms. King temporary partial disability benefits in regular intervals until Ms. King is no longer eligible for those benefits by reaching maximum medical improvement or by release without restrictions by the authorized treating physician. Ms. King shall timely provide Al's Foodland or its workers' compensation carrier with a copy of her paychecks to allow proper calculation of her ongoing temporary partial disability benefits.

8.  This matter is set for Initial Hearing on **Tuesday, July 14, 2015, at 9:00 a.m. central,** 10:00 a.m. eastern.

9.  Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven (7) business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Division by email to WCCompliance.Program@tn.gov no later than the seventh (7th) business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance may result in a penalty assessment for non-compliance.

10. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email WCCompliance.Program@tn.gov or by calling (615) 253-1471 or (615) 532-1309.

**ENTERED this the 5th day of June, 2015.**

**HON. PAMELA B. JOHNSON**
**Workers' Compensation Judge**

13

Initial Hearing:

An Initial Hearing has been set on **July 14, 2015,** at **9:00 a.m. central,** 10:00 a.m. eastern time with Judge Pamela B. Johnson for the Court of Workers' Compensation Claims. You must call (855) 543-5041 or toll free at 865-594-0091 to participate in the Initial Hearing.

Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation.

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal."

2. File the completed form with the Court Clerk *within seven (7) business days* of the date the Expedited Hearing Order was entered by the Workers' Compensation Judge.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The parties, having the responsibility of ensuring a complete record on appeal, may request from the Court Clerk the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a statement of the evidence within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must be approved by the Judge before the record is submitted to the Clerk of the Appeals Board.

5. If the appellant elects to file a position statement in support of the interlocutory appeal, the appealing party shall file such position statement with the Court Clerk within three (3) business days of the filing of the Expedited Hearing Notice of Appeal, specifying the issues presented for review and including any argument in support thereof. If the appellee elects to file a response in opposition to the interlocutory appeal, appellee shall do so within three (3) business days of the filing of the appellant's position statement.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 5th day of June, 2015.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Anna M. King, *pro se* | X | | X | 2217 Double Log Cabin Road Lebanon, Tennessee 37087 kingroofingco@gmail.com |
| Frederick W. Hodge, Esq. | | | X | fhodge@howell-fisher.com |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov

15